**In Re: DeFACTO CONDEMNATION AND TAKING OF LANDS OF WBF ASSOCIATES, L.P. by Lehigh–Northampton Airport Authority**

**Lehigh–Northampton Airport Authority**

**WBF Associates, L.P. and C.T. Fuller n/k/a C. Thomas Fuller**

**Lehigh–Northampton Airport Authority, Appellant**

**In Re: DeFacto Condemnation and Taking of Lands of WBF Associates, L.P. by Lehigh–Northampton Airport Authority**

**Appeal of: WBF Associates, L.P.**

**Lehigh–Northampton Airport Authority Lehigh Valley International Airport**

**v.**

**C.T. Fuller a/i/a C. Thomas Fuller and WBF Associates, L.P.**

**Appeal of: C.T. Fuller a/i/a C. Thomas Fuller.**

Commonwealth Court of Pennsylvania.

Argued April 2, 2009.

Decided April 28, 2009.

Michael D. Klein, Washington, DC, for designated appellant, Lehigh–Northampton Airport Authority.

Michael S. Hino, Berwyn, for appellee, C. Thomas Fuller.

Kevin T. Fogerty, Allentown, for appellee, WBF Associates, L.P.

BEFORE: COHN JUBELIRER, Judge, and SIMPSON, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Senior Judge FRIEDMAN.

This eminent domain case was initiated on September 30, 1996, and is now before our court for the third time. The case concerns Lehigh–Northampton Airport Authority's (LNAA) *de facto* taking of property owned by WBF Associates, L.P. (WBF), which occurred as a result of LNAA's planned expansion of the Lehigh Valley International Airport (Airport). Currently before the court is LNAA's appeal from the October 10, 2008, entry of judgment in favor of WBF and against LNAA in the amount of $24,219,887.61, plus continuing accruing mortgage interest, delay damages and attorneys' expenses and appraisal fees. Consolidated with this appeal are LNAA's appeals from the September 3, 2008, order of the Court of Common Pleas of Lehigh County (trial court) denying LNAA's motion for a new trial and the trial court's September 18, 2008, order denying LNAA's motion to mold the verdict,[1] which resulted in the October 10, 2008, entry of judgment.

On September 27, 1990, WBF purchased an undeveloped 632–acre tract of land (Property) from C. Thomas Fuller (Fuller). The Property, which spans three townships, (East Allen Township, Allen Township and Hanover Township), is located just north of the Airport operated by LNAA. Fuller retained a first mortgage on the Property and later granted WBF a line of credit secured by a second mortgage. WBF planned to develop the Prop-

---

1. The order denying LNAA's motion to mold the verdict was issued on September 17, 2008, and entered the next day. By order dated December 2, 2008, this court incorpo- rated into LNAA's appeal the issues presented by and within the trial court's September 3, 2008, and September 18, 2008, orders, respectively.

erty into a planned residential development (PRD) of 1,488 residential units (Windwillow). To that end: WBF entered a joint venture agreement with Lanid Corporation (Lanid), a developer that was to supply partial funding for Windwillow; WBF and Lanid obtained zoning changes and final approvals from East Allen and Hanover Townships and were seeking approval from Allen Township; and WBF spent considerable sums on development costs for Windwillow.

However, the Windwillow project was halted in January of 1994, when LNAA publicly announced that it would be acquiring approximately 1,500 acres of land north of the Airport for Airport expansion. The expansion area included all of WBF's 632 acres. The announcement of the Airport expansion received widespread publicity, and LNAA started acquiring properties within the 1,500–acre expansion area. As a direct effect of LNAA's actions, Lanid terminated its participation in the Windwillow project, and WBF was unable to attract new investment partners due to LNAA's condemnation plans. Consequently, WBF was unable to move forward with Windwillow for lack of financing, and WBF defaulted on its first and second mortgages. Fuller filed a successful foreclosure action on the second mortgage in June of 1997, and WBF was just able to avoid an upset tax sale of the Property in September of 1997.

On September 30, 1996, WBF filed a petition for appointment of a board of viewers pursuant to section 502(e) of the Eminent Domain Code (Code), 26 P.S.

§ 1–502(e),[2] alleging a *de facto* taking of its Property due to LNAA's announced Airport expansion plan and the consequential collapse of the Windwillow project. LNAA filed preliminary objections, and, in lieu of an evidentiary hearing, the parties agreed to present evidence before the trial court consisting of deposition testimony, pleadings, affidavits, record papers, discovery responses and numerous exhibits. The trial court made findings based upon the extensive record, briefing and oral argument. Particularly relevant here are Judge James Knoll Gardner's Findings of Fact, Nos. 10 and 16, which provide as follows:

10. WBF planned to develop its property into a planned residential development consisting of 1,488 units.

16. The highest and best use of WBF's property is as a planned residential development.

(R.R. at 7a–8a, footnote omitted.) The trial court determined that WBF successfully established a *de facto* taking of its Property on September 30, 1996, and, by order dated June 15, 1998, dismissed LNAA's preliminary objections and granted WBF's petition for appointment of a board of viewers. In doing so, Judge Gardner noted that Lanid had successfully developed twelve larger PRDs prior to becoming involved in Windwillow and that Lanid was prepared to invest its resources and experience into WBF's development project before learning of the planned Airport expansion. Judge Gardner then added, "[w]e have every reason to believe that if the [P]roperty had been developed, the

---

2. WBF filed its petition under the former Eminent Domain Code, Act of June 22, 1964, Special Sess., P.L. 84, *as amended, formerly*, 26 P.S. §§ 1–101—1–903, repealed by section 5 of the Act of May 4, 2006, P.L. 112, and replaced by the consolidated Eminent Domain Code, 26 Pa.C.S. §§ 101–1106. Because of the dates involved in this action, the

former version of the Eminent Domain Code applies. Section 502(e) of the Code provides that where a compensable injury is suffered for which no declaration of taking has been filed, a condemnee may file a petition for the appointment of a board of viewers setting forth such injury.

homes which were built would have been sold." (R.R. at 32a.) Citing these reasons, Judge Gardner found that the damages in the case were not too speculative to be determined by a board of viewers.

Following LNAA's appeal, this court affirmed the trial court's determination of a *de facto* taking, and our supreme court subsequently denied LNAA's petition for allowance of appeal. *Lehigh–Northampton Airport Authority v. WBF Associates, L.P.*, 728 A.2d 981 (Pa.Cmwlth.) (hereafter, *WBF I*), *appeal denied*, 560 Pa. 751, 747 A.2d 372 (1999). Thereafter, WBF filed a motion to compel LNAA to pay estimated just compensation (EJC) to WBF, and Fuller filed a motion for an order requiring LNAA to pay the EJC to Fuller.[3] In an effort to settle this dispute, WBF and Fuller executed a Stipulation detailing the history, terms and money due under each of the two mortgages between the parties and setting forth a statement that included the principal amounts, along with the accrued and continuing interest. On November 2, 2000, after the addition of an addendum indicating LNAA's agreement to these terms, the trial court entered the Stipulation as an order. On that same date, LNAA gave Fuller a check for the full EJC payment of $3,150,000.

Prior to the board of viewers' hearings, LNAA sent notices to three individuals

who had testified on the issue of highest and best use of the Property in the earlier *de facto* taking proceedings. LNAA sought to re-depose these people regarding the Property's highest and best use for the purpose of establishing the fair market value of the Property before the board of viewers. WBF objected and filed for a protective order, alleging that Judge Gardner's findings in his June 15, 1998, opinion constituted the "law of the case" with respect to the issue of the highest and best use of the Property. By order dated November 3, 2000, Judge Gardner granted the protective order and barred LNAA "from pursuing discovery, and from attempting to offer evidence at trial, on issues previously ruled on by this Court in its June 15, 1998, opinion, including the findings of fact and conclusions of law set forth therein, and particularly including, but not limited to, Findings of Fact Numbers *10*, 15, *16*, 25, 26, 40, 41, and 49."[4] (November 3, 2000, Order, filed December 13, 2000, emphasis added). Accordingly, at the board of viewers' hearings, LNAA restricted its appraisal testimony to the value of the Property as a PRD.

In a supplemental proceeding, WBF sought recovery of mortgage interest and delay damages pursuant to sections 609 and 611 of the Code,[5] 26 P.S. §§ 1–609 and

---

3. In order to protect his interest as mortgagee of the Property, Fuller had filed a petition to intervene in the proceedings pursuant to section 506(b) of the Code, 26 P.S. § 1–506(b), which the trial court granted.

4. In addition to findings 10 and 16, which were quoted above, the other findings listed in Judge Gardner's November 3, 2000, order establish that: a comprehensive market study determined that a demand existed for the proposed Windwillow project; final approval for Windwillow was obtained from both East Allen and Hanover Townships; Lanid terminated involvement in Windwillow because it believed the project was impaired by the pro-

posed Airport expansion; other potential investors refused to invest in Windwillow because of potential condemnation by LNAA; and WBF had no internal financial difficulties prior to the announcement of the proposed Airport expansion. (R.R. at 8a, 10a, 14a–15a.)

5. Section 609 of the Code provides that where a condemnee institutes proceedings under section 502(e) of the Code, an award of compensation shall include reimbursement of reasonable appraisal, attorney and engineering fees and other costs and expenses actually incurred. 26 P.S. § 1–609. Section 611 of the Code provides that a condemnee shall not

1–611. The board of viewers awarded WBF $8,500,000 in damages for the value of the Property and awarded mortgage interest and delay damages from September 30, 1996, the day of the taking. Thereafter, WBF, LNAA and Fuller filed appeals from the report of the board of viewers and demanded a jury trial pursuant to sections 515 and 516(a) of the Code, 26 P.S. §§ 1–515 and 1–516(a). The parties also filed motions for preliminary determinations pursuant to section 517 of the Code,[6] 26 P.S. § 1–517, asking that, prior to the trial *de novo,* the trial court resolve various legal issues.

Due to the unavailability of Judge Gardner, Judge Carol K. McGinley took over the case and ruled on the preliminary determinations. In an opinion and order dated June 27, 2003, Judge McGinley determined that: (1) *LNAA could present evidence at trial regarding the highest and best use of the Property as it relates to a determination of fair market value and just compensation;* (2) LNAA was precluded from challenging the validity of the WBF/Fuller mortgages; (3) WBF was entitled to recover mortgage interest from September 30, 1996; (4) WBF was entitled to delay damages from September 30, 1996; (5) LNAA must receive credit for payment of the EJC from November 2, 2000; and (6) WBF was entitled to recover its reasonable attorneys', appraisal and engineering fees.

All parties appealed from the trial court's June 27, 2003, order, and this court affirmed in part and reversed in part. *In re De Facto Condemnation and Taking of Lands of WBF Associates, L.P.,* 845 A.2d 967 (Pa.Cmwlth.2004). Thereafter, our supreme court granted allowance of appeal and affirmed in part and reversed in part. *In re De Facto Condemnation and Taking of Lands of WBF Associates, L.P.,* 588 Pa. 242, 903 A.2d 1192 (2006) (hereafter *WBF III* ). Of relevance here, our supreme court held that: (1) WBF is entitled to delay damages from September 30, 1996, to include all mortgage interest actually incurred until the date of payment of the award; and (2) *LNAA was not permitted to relitigate the highest and best use in its appeal following the determination of the board of viewers. Id.*

After remand to the trial court, the parties filed pre-trial motions concerning the admissibility of testimony from LNAA's expert witnesses that it was not legally or physically feasible to create 1,488 units on the Property. WBF sought to preclude that testimony on the grounds that it was contrary to prior orders in the case or otherwise inappropriate, asserting that Judge Gardner's June 15, 1998, ruling of a *de facto* taking was premised on the devel-

receive delay compensation for the period he remains in possession after the condemnation or for the period that the condemnee remains entitled to charge for use of the condemned property. However, delay compensation of six percent per annum is paid from the date of relinquishment of possession of the condemned property, or, if the condemnation is effectuated without relinquishment of possession, delay compensation is paid from the date of condemnation. Delay compensation is not to be included by the viewers as part of the award; instead, at the time of payment of the award, it is calculated and added thereto. 26 P.S. § 1–611.

**6.** Section 517 of the Code provides that, with respect to appeals from the report of a board of viewers, "[a]ll objections, other than to the amount of the award, raised by the appeal shall be determined by the court preliminarily. The court may confirm, modify, change the report or refer it back to the same or other viewers. A decree confirming, modifying or changing the report shall constitute a final order." 26 P.S. § 1–517. The intent of this section of the Code is to permit the court to preliminarily dispose of purely legal issues raised by the parties that are basic to the inquiry. *WBF I.*

opment of the Property pursuant to the 1,488–unit Windwillow project. (*See* R.R. at 104a–06a.) LNAA countered that WBF's plans for development in Allen Township were never finalized prior to the commencement of this proceeding and, thus, were not governed by the findings in Judge Gardner's June 15, 1998, opinion. (R.R. at 108a–12a.) By order dated October 9, 2007, the trial court quoted Judge Gardner's November 3, 2000, protective order verbatim and granted WBF's motion in limine. In essence, the trial court ruled that, in accordance with Judge Gardner's protective order and our supreme court's decision in *WBF III*, the Property had to be valued as the 1,488–unit Windwillow PRD for highest and best use purposes, and LNAA could not present evidence referring to a different sized development.[7] (R.R. at 145a–46a.)

On March 3, 2008, a jury trial to determine just compensation damages commenced. At the conclusion of the trial, the jury returned a verdict of $10,410,000 as just compensation for LNAA's *de facto* taking of WBF's Property. (R.R. at 148a.) LNAA, WBF and Fuller each filed post-trial motions requesting a new trial, (R.R. at 178a–86a, 201a–06a, 217a–21a), and motions to mold the verdict. (R.R. at 154a–90a, 188a–96a, 211a–13a, 223a–49a.) In connection with the latter motions, the trial court held an evidentiary hearing on May 2, 2008, to receive evidence on delay damages, mortgage interest and attorneys' fees payable to WBF.

Following that hearing, and after extensive briefing and argument, the trial court, by order dated September 3, 2008, denied the parties' respective motions for a new trial. (R.R. at 1809a–19a.) By order entered September 18, 2008, the trial court granted WBF's motion to mold the verdict, denied LNAA's motion to mold the verdict and awarded WBF: (1) $9,503,426.00 of delay damages, at prime plus 1%, from September 30, 1996, through August 30, 2008, accruing thereafter at the rate of prime plus 1%; (2) $6,898,658.00 of mortgage interest from September 30, 1996, through August 31, 2008, accruing thereafter at the rate of $1,462.81 per day; and (3) $437,125.03 for attorneys', engineering and appraisal fees through March 31, 2008, for a total molded verdict of $24,099,236.02, after deduction of $3,150,000 for the EJC paid. (R.R. at 3840a–42a.) Judgment against LNAA in the amount of $24,219,887.61 (reflecting additional interest that accrued after the September 18, 2008, order) was entered on October 10, 2008. (R.R. at 3838a–39a.)

■ LNAA now appeals to this court from the trial court's denial of its motion for post-trial relief and its motion to mold the verdict.[8] LNAA asks this court to reverse the judgment entered on the jury verdict and remand for a new trial; alternatively, LNAA asks that we mold the verdict in accordance with LNAA's calculations.

## I. New Trial

LNAA argues that it is entitled to a new trial because: (a) the trial court erred in

7. On March 18, 2008, the trial court ruled that LNAA's motion in limine was moot. (R.R. at 152a.)

8. Our scope of review of the trial court's ruling on a motion for post trial relief is limited. In general, we will not disturb the trial court's ruling unless the court manifestly abused its discretion or committed an error of law that affected the outcome of the case.

Stated differently, this court's inquiry is to determine whether the trial court acted capriciously or palpably abused its discretion. *Tedesco v. Municipal Authority of Hazle Township*, 799 A.2d 931 (Pa.Cmwlth.2002), *appeal denied*, 573 Pa. 669, 820 A.2d 706 (2003); *In re Redevelopment Authority*, 35 Pa.Cmwlth. 415, 386 A.2d 1052 (1978).

concluding that Judge Gardner's opinions established the highest and best use of the Property as the 1,488–unit Windwillow PRD; (b) the trial court erred in excluding portions of LNAA's valuation testimony and evidence, permitting WBF to enter evidence about the Property's 1990 purchase price and denying LNAA's requests to remove a juror for inattentiveness and sleeping during trial; and/or (c) the jury verdict was excessive and against the weight of the evidence. We consider each of these arguments in turn.

### A. Highest and Best Use

LNAA argues that the trial court erred by holding that the fair market value of the Property must be based exclusively on its development as the 1,488–unit Windwillow PRD and by precluding LNAA from offering evidence and testimony about any other PRD design. LNAA maintains that its evidence regarding the Windwillow project was essential to a true determination of the Property's fair market value and that the jury should have been allowed to hear testimony or other evidence indicating that, as planned, Windwillow was neither physically nor legally feasible and could only be developed with fewer units. LNAA contends that, because this essential evidence was excluded, the jury was left with an incorrect assessment of the Property's value and returned an excessive verdict, thus warranting a new trial. See *Kremer v. Janet Fleisher Gallery, Inc.*, 320 Pa.Super. 384, 467 A.2d 377 (1983).

LNAA concedes that, pursuant to *WBF III*, the findings in Judge Gardner's June 15, 1998, decision are now the law of the case. However, LNAA maintains that the trial court improperly combined Findings of Fact, No. 10 (WBF *planned to develop* its Property into *a 1,488–unit PRD* ) and No. 16 (the highest and best use of WBF's Property is as *a PRD* ) to determine that

the highest and best use of the Property was *the 1,488–unit Windwillow PRD.* According to LNAA, the earlier order held only that the highest and best use was as "a PRD" and in no way limited the damages phase of the condemnation proceeding to the fiction that WBF's proposed Windwillow PRD would receive all necessary legal approvals and would be financially and physically feasible. LNAA maintains that the trial court's faulty interpretation of Judge Gardner's decision eviscerated the damages phase of the case, where the character of the specific PRD that actually could be developed on the Property remained at issue, and prevented the jury from making an informed determination of the Property's value.

WBF counters that, in his protective order of November 3, 2000, Judge Gardner ruled that LNAA could not pursue discovery or offer evidence during the damages phase of the case on issues previously ruled on in the June 15, 1998, opinion on *de facto* taking, and he specifically identified Findings of Fact, Nos. 10 and 16 as among those not subject to further evidentiary discussion. WBF also points out that, during the *de facto* taking phase of the case, no plan other than the 1,488–unit Windwillow PRD was presented to Judge Gardner, and, citing Judge Gardner's repeated references to Windwillow, WBF argues that *this* PRD plan obviously was integral to Judge Gardner's determination of highest and best use. WBF notes that Judge Gardner placed particular emphasis on the fact that Windwillow would have been successful if it had been built, that approvals for the project had been obtained in two of the three municipalities and that approvals were progressing as planned in the third township before LNAA's actions effectively ended the project.

WBF also contends that LNAA had ample opportunity to litigate highest and best use in the *de facto* taking proceedings. According to WBF, because LNAA could have offered evidence undercutting WBF's plan for the 1,488–unit Windwillow PRD during that portion of the case, permitting LNAA to offer such evidence over a decade later would violate the law of the case. We agree.

Although Judge Gardner did not *specifically* find that the highest and best use of the Property was as a "1,488–unit" PRD, we are satisfied that the trial court's interpretation of Judge Gardner's 1998 opinion and 2000 protective order is reasonable and is supported by the prior appellate opinions in this case.[9] Because the trial

---

9. In affirming Judge Gardner's *de facto* taking determination, this court recounted much of the testimony credited by Judge Gardner in determining the highest and best use of the Property; that testimony clearly focused on using the Property as the proposed Windwillow PRD. We stated, in relevant part, as follows:

> The trial court also determined that WBF was deprived of the use of, and faced the potential loss of, its property as a direct consequence of LNAA's actions concerning the 1,500–acre Airport expansion. In making the determination of causation, the trial court relied upon the testimony of McNally, Shuman and Sznajderman, all three of whom offered testimony concerning the detrimental effect that LNAA's publicly announced Airport expansion plans and related activities had **on the Windwillow Project**.... McNally clearly indicated that a great deal of money and expertise had gone into planning **for the Windwillow Project and that the Project was extremely promising**. Further, McNally testified that development was proceeding as expected but that LNAA's actions, including asking township representatives to delay or stop the approval process **for the Windwillow Project** and publicizing both the Airport expansion plans and the acquisition of nearby properties, were directly responsible for **the Project's** eventual failure.... Finally, **Sznajderman confirmed that the highest and best use for WBF's property was the PRD envisioned by WBF** ... Based on the testimony of Shuman, McNally and Sznajderman, the trial court found that **WBF's inability to proceed with the Windwillow Project substantially deprived WBF of the beneficial use and enjoyment of its property** as a direct and necessary consequence of LNAA's activities connected to the proposed Airport expansion.... Because the testimony accepted by the trial court here provides substantial evidence to support its findings, we will not disturb those findings on appeal.... **The record supports the determination that LNAA's proposed Airport expansion and its accompanying publicity, property acquisitions and other connected activities precluded WBF's development of the subject property for its highest and best use where investors refused to become involved in the Windwillow Project** because of the property's inevitable condemnation. Thus, the damage alleged here is neither prospective nor too speculative to be determined by a board of viewers.

*WBF I*, 728 A.2d at 990–93 (citations and footnote omitted, emphasis added).

In *WBF III*, our supreme court discussed LNAA's ability to relitigate the Property's highest and best use in the damages phase of the case and stated as follows:

> In the instant matter, Judge Gardner ruled, as an evidentiary ruling, that [LNAA] was prohibited from presenting additional testimony from the condemnee's experts in the damages phase, who had already testified by deposition in the initial proceeding, as to the highest and best use of the property. **The highest and best use was a determination that was fully litigated by the parties and formed an integral part of Judge Gardner's decision that a *de facto* taking had occurred.** ... Before the Board of Viewers, [LNAA] sought to depose the same experts who testified in the initial phase of the proceedings in order to establish the highest and best use for purposes of the board of viewers' assessment of damages. **We fail to see how the determination of the highest and best use can differ from that determined within the context of a *de facto* taking and that determined as part of fair market value in two separate but related phases of the same litigation. The highest and best use is the highest and best use.** ... The actual issue, the highest and best

court did not abuse its discretion in restricting evidence on highest and best use to development of the Property as a 1,488–unit PRD, a new trial could not be granted on this basis.

## B. Trial Court Rulings

LNAA also argues that the trial court committed various significant errors prejudicial to LNAA that contributed to a jury verdict overstating fair market value for the Property and, thus, warranted a new trial. In particular, LNAA contends that the trial court improperly excluded portions of LNAA's valuation testimony and evidence, permitted WBF to enter evidence about the Property's 1990 purchase price and denied LNAA's requests to remove a juror for inattentiveness and sleeping during trial.

### 1. Rulings on WBF's Motion in Limine

LNAA challenges the trial court's rulings on WBF's Motion in Limine. Specifically, LNAA argues that the trial court erred in granting WBF's request to exclude: (1) the valuation testimony of Don Paul Shearer because he did not appraise the Property as the Windwillow PRD but, rather, valued the Property on the basis of acreage having the potential for development as a PRD; (2) the testimony of expert witnesses from Gannett Fleming on potential PRD scenarios for the Property and portions of the Gannett Fleming report discussing why Windwillow was neither physically nor legally feasible; (3) the valuation testimony of John Coyle and the portion of Coyle's report, all based on the Gannett Fleming expert report, dealing

with the fair market value of the Property with less than 1,488 units and explaining why the Property could not be valued as the Windwillow PRD; and (4) the expert testimony of Richard Koch, of Gannett Fleming, on the problems and success rates of PRDs in the Lehigh Valley, as well as the portion of the Gannett Fleming report containing information on that subject.

In each case, the question of whether exclusion of this testimony and evidence was reversible error turns on resolution of the issue of the highest and best use of the Property, i.e., whether it is a PRD or whether it is the 1,488–unit Windwillow PRD. Because we conclude that the parties were properly limited to presenting evidence on the value of the Property as a 1,488–unit PRD, the trial court made the appropriate pre-trial rulings; thus, a new trial could not be granted on this basis.

### 2. Rulings at Trial

#### a. Scott Hughes

LNAA argues that the trial court erred in precluding Scott Hughes from testifying about what Lawrence Krauter of LNAA told him as to why LNAA hired Gannett Fleming to perform expert witness services, namely that Gannett Fleming was being hired because LNAA had a fiduciary responsibility to the taxpayers and to users of the Airport to make sure that WBF was awarded no more than the fair market value of the Property. LNAA contends that exclusion of Hughes' testimony in this regard was particularly prejudicial to LNAA because WBF had been allowed to present evidence attacking the

use of the property, was the same in both instances, and **the highest and best use of property for purposes of ascertaining a taking is the same as the highest and best use for purposes of setting the fair market value. The parties were the same and all** parties had a full and fair opportunity to **litigate that issue before Judge Gardner.** The decision of Judge Gardner became the law of the case....
*WBF III,* 588 Pa. at 272–74, 903 A.2d at 1209–11 (emphasis added).

motivations of LNAA's expert witnesses from Gannett Fleming, whereas LNAA was denied an opportunity to counter WBF's insinuations. According to LNAA, these evidentiary errors likely engendered mistrust of LNAA's witnesses in the minds of the jury and, thus, led the jury to return an excessive verdict.

However, we agree that the precluded testimony regarding the motives for hiring experts from Gannett Fleming was self-serving, irrelevant and, most importantly, hearsay. Experts may base their opinions on hearsay if it is of a type reasonably relied upon by experts in a particular field in forming opinions or inferences on a subject, Pa. R. Evid. 703; however, LNAA's reasons for hiring Gannett Fleming are completely unrelated to, and have no impact on, Hughes' appraisal of the Property. Because the trial judge did not abuse her discretion in excluding testimony on this collateral matter,[10] a new trial could not be granted on this basis.

### b. Ara Mouradian

■ LNAA argues that the trial court erred in precluding Ara Mouradian from testifying about his conversations with an unnamed Airport employee regarding the Airport's experience with sinkholes on its land, including the costs of remediation. LNAA contends that this testimony was relevant to the valuation of the Property because the Property likely contains sink-holes similar to those on the adjacent Airport property and would require similar expenditures to remediate, thereby affecting the Property's fair market value. Experts for both WBF and LNAA made downward adjustments of value to reflect the presence of sinkholes on the Property; however, LNAA contends that, given the

significant disparity of these amounts, Mouradian's testimony was critical in that it would have supported the $4,000,000 deduction made by LNAA's appraiser. We disagree.

■ As the trial court pointed out, LNAA could and should have had the Airport employee provide this testimony. Moreover, even if the testimony is not inadmissible hearsay, see Pa. R. Evid. 703, Mouradian's testimony about sinkhole experiences on Airport land was both irrelevant for purposes of valuing the Property at issue and was cumulative of testimony already provided. During trial, LNAA's witness Lawrence Krauter testified regarding the Airport's sinkhole experience, (R.R. at 814a–20a), and he admitted on cross-examination that the "sinkhole map" prepared by Mouradian showed many sinkholes on the Airport property but virtually none on WBF's Property. (R.R. at 822a–23a, 1963a.) The trial court may exclude evidence that is irrelevant, confusing, misleading, cumulative or prejudicial. *Concorde Investments, Inc. v. Gallagher,* 345 Pa.Super. 49, 497 A.2d 637 (1985). Here, the trial judge's decision to exclude Mouradian's testimony was a proper exercise of discretion and was not grounds for a new trial.

### c. 1990 Sale

■ LNAA argues that the trial court committed reversible error when it allowed WBF, over LNAA's objection, to enter evidence and make closing statements about the $7,975,000 price it paid for the Property in 1990, despite the trial court's prior statements that this information was not relevant to the fair market value of the Property at the time of taking in 1996.

10. Even if Judge McGinley's ruling was error, LNAA failed to demonstrate that any preju-

dice resulted from that error.

LNAA contends that evidence of the 1990 sale price not only was irrelevant but also was misleading because the sale was not the result of an arms-length transaction. Judge McGinley instructed the jury that the 1990 purchase price could not be used in determining the fair market value of the Property. However, LNAA asserts that, once this sales price was presented as a "starting point" for the jury to determine value, the prejudice against LNAA could not be undone. Claiming that this evidentiary error contributed to an excessive jury verdict, LNAA argues that it was entitled to a new trial. We disagree.

In *In re Redevelopment Authority*, 35 Pa.Cmwlth. 415, 386 A.2d 1052, 1058 (1978), this court discussed the standard applicable when determining whether to admit evidence of a property's purchase price, stating as follows:

> Our decision here ... should not be construed to suggest that the wise trial judge will generally exclude evidence of the condemnee's purchase price. Just the opposite is true. In exercising his discretion in this area, the trial judge should start with the premise that the condemnee's purchase price or other indication of value by him, as logically relevant evidence, should be admitted. However, he must determine whether the probative value of this evidence is outweighed by other factors which would confuse the issue by unduly distracting the jury from its primary inquiry as to the present value of the property. Factors to be considered are: (1) the circumstances of the sale or other occurrence involved, e.g., whether it covered the same property, whether it was a voluntary one between a willing and informed seller and buyer, or whether it was made with condemnation in mind; (2) whether it was remote in time from the date of condemnation; (3) what changes had occurred in real estate val-

ues in the area or in the general character of the neighborhood in the interim; and (4) what changes had occurred in the subject property. As to (3) and (4), these factors should generally be considered as going to the weight of the evidence, not to its admissibility.

*See also Tedesco v. Municipal Authority of Hazle Township*, 799 A.2d 931 (Pa. Cmwlth.2002) (stating that in applying the reasonable time standard, the court will consider whether there has been a change in the condemned property during the passage of time), *appeal denied*, 573 Pa. 669, 820 A.2d 706 (2003); *Klick v. Department of Transportation*, 20 Pa.Cmwlth. 627, 342 A.2d 794 (1975) (noting that as a general principle, a sale between three to seven years before the condemnation will be found to have occurred within a "reasonable" time but upholding the trial court's ruling to exclude a five-year-old sale from evidence because of the rapid inflation in real estate prices and the changing character of the neighborhood).

Explaining its decision to allow evidence of the 1990 sale into evidence, the trial court stated that, although LNAA argued that the 1990 sale was not an arms-length transaction, LNAA did not assert a change in the value of the Property between the 1990 sale and the 1996 taking. (R.R. at 742a–43a.) After the evidence was admitted, LNAA was permitted to explore, without restriction, the nature of the transaction that took place. In addition, the trial court specifically instructed the jury with respect to this evidence, stating, "The 1990 purchase price of the [P]roperty is not to be considered by you in determining the value of the [P]roperty in 1996. I simply allowed that testimony so you had a chance to hear the full details of the real estate transaction that led to this point." (R.R. at 1625a.)

Here, the six-year old sale falls within the time parameters approved by this Court in *Klick*, and the trial court found that there was no evidence of a significant change in the Property in the interval between the sale and the condemnation. Moreover, the trial court reasoned that LNAA was afforded the opportunity to present evidence to the jury regarding the nature of the sale, i.e., whether it was an arms length sale. (*See* R.R. at 775a–80a.) Under these circumstances, we are satisfied that the trial judge did not err in deciding to admit this evidence, and there was no reason to grant a new trial on this basis.

### d. Exclusion of Juror

LNAA argues that the trial court should have removed juror #2 for inattentiveness and sleeping during crucial parts of the trial because a juror who does not hear all of the evidence or the court's instructions as to principles of law is not qualified to render a verdict. LNAA acknowledges that a complaining party must demonstrate that it suffered actual prejudice in cases involving sleeping jurors. *Commonwealth v. Lawson*, 762 A.2d 753 (Pa.Super.2000) (denying a claim of ineffective assistance of counsel based on counsel's failure to request dismissal of an alleged sleeping juror, where the complaining party did not demonstrate that the outcome of the trial would have been different), *appeal denied*, 566 Pa. 638, 781 A.2d 141 (2001). However, LNAA asserts that it was prejudiced here because juror #2 was chronically inattentive during LNAA's case-in-chief but was awake during WBF"s case-in-chief. According to LNAA, this created a substantial likelihood that juror #2 did not fully and fairly consider LNAA's position and influenced the verdict in favor of WBF; therefore, the trial court's repeated refusals to re-place juror #2 with an alternate warrants a new trial. We disagree.

The decision of whether to seat an alternate juror is within the judge's discretion. *Rural Area Concerned Citizens v. Fayette County Zoning Hearing Board*, 166 Pa.Cmwlth. 520, 646 A.2d 717 (1994), *appeal denied*, 540 Pa. 636, 658 A.2d 798 (1995); *Commonwealth v. Jones*, 314 Pa.Super. 497, 461 A.2d 267 (1983). "[T]he mere appearance of [a juror or fact finder] dozing may not be taken as a clear indication that an individual is asleep, and is missing relevant testimony." *Rural Area*, 646 A.2d at 725–26 (citing *Jones*). Moreover, even if a juror nods off, it must be demonstrated that he actually missed portions of the testimony, and the complaining party must demonstrate that he suffered actual prejudice. *Lawson.*

Here, the trial court recognized that juror #2 occasionally and obviously lost interest in the proceedings, but the trial court also observed that the periods of time in which this occurred were brief in comparison to the length of the trial, during which the testimony was often repetitive. Thus, the trial court explained that the juror's periods of inattentiveness were not such that he could not deliberate competently upon the evidence. (Trial ct. op. at 6–7, R.R. at 1815a–16a.) Because juror #2 was not completely inattentive throughout the trial, and because LNAA offered nothing to demonstrate how it actually was prejudiced by this one juror's inattentiveness, we cannot say that the trial judge abused her discretion in deciding not to dismiss juror #2 and, thus, there were no grounds to order a new trial on this basis.

### C. Excessive Verdict

Finally, LNAA argues that a new trial should have been granted because the $10,410,000 verdict was against the weight

of the evidence and so excessive that it created the impression that the jury was influenced by sympathy, prejudice or passion. *See Swartz v. Smokowitz*, 400 Pa. 109, 161 A.2d 330 (1960). LNAA maintains that the size of the verdict is an obvious reflection of the jury's anti-condemnation bias. Moreover, LNAA asserts that it presented much more detailed, substantial and credible evidence than WBF regarding the value of the Property, particularly with respect to costs required to remediate sinkholes, develop a PRD, transport water and provide adequate sewers and roads, and yet the jury improperly ignored this testimony. According to LNAA, the jury should have accepted the testimony of its witnesses regarding these costs and deducted them from the appraisals of the Property offered by WBF's experts. We disagree.

█ Here, WBF presented real estate appraisers, Reaves Lukens and Albert Hughes, who each concluded that the fair market value of the Property exceeded $14 million. (R.R. at 603a, 749a.) John Coyle, LNAA's appraisal expert, testified that the fair market value was $6,645,000.[11] (R.R. at 1465a.) In addition, the jury took an extensive view of the Property and its verdict of $10,410,000 falls between these valuations. In *Tedesco*, this court held that it is reversible error to grant a new trial where, as here, the jury's verdict falls within the range of expert testimony on value because, in a condemnation case, it is the province of the jury to weigh the credibility of the conflicting testimony and determine the fair market value of the property at the time of the condemnation. Moreover, where, as here, the jury views the premises, its award is entitled to spe-

cial weight upon appellate review. *Id.* Indeed, where a jury views the site, this Court has held that the jury may base its verdict on its own judgment and disregard the expert testimony entirely. *Id.* Because the jury's verdict here was within the range of the experts' valuations, was based on a view of the Property and was amply supported by evidence in the record, the trial court did not abuse its discretion in denying a new trial on this basis.

## II. Molded Verdict

█ Assuming that a new trial is not granted, LNAA alternatively argues that the trial court erred in molding the verdict by ignoring the terms of the Stipulation when applying the $3,150,000 of EJC paid by LNAA against the verdict and by improperly assessing mortgage interest and delay damages. We disagree.

The Stipulation provides that, upon receipt by Fuller of the EJC paid by LNAA, that amount shall be applied as follows: first to accrued interest on the first mortgage; second to principal owed on the first mortgage; third to accrued interest on the second mortgage judgment; and fourth to principal owed on the second mortgage judgment. (Stipulation at 5, R.R. at 41a.) The Stipulation also provides that, as of June 30, 2000, the debts secured by the liens on the mortgages are as follows:

a. First Mortgage—

i. Principal $8,063,581.01

ii. **Accrued Interest $0 (all interest compounded to 06.30.00)**

iii. Continuing Interest $2,239.26 per diem (principal balance multiplied by 0.0002777)

11. The trial court noted that all the experts were equally qualified and offered thorough support for their estimates, with the disparity reflecting the extent of corrective work that might be required for sinkholes on the Property and the amount of work expected to be required by the three townships in which the Property was located.

(Stipulation at 3, R.R. at 39a, emphasis added.)

LNAA reads this portion of the Stipulation to say that there was **no** accrued interest on the first mortgage as of June 30, 2000. Based on that assumption, LNAA contends that, properly calculated, the amount that WBF/Fuller should be awarded as of September 9, 2008, is $19,891,033.[12]

In urging us to accept its calculations, LNAA ignores two crucial facts. First, our supreme court ordered LNAA to pay WBF for all mortgage interest that accrued between September 30, 1996, and June 30, 2000. *WBF III*, 588 Pa. at 265, 903 A.2d at 1206 (stating, "WBF is entitled to all mortgage interest from the date of taking to the date of the EJC payment, plus all mortgage interest from the date of EJC payment to the date of the award that it has actually incurred."). Second, contrary to LNAA's claim, mortgage interest undeniably accrued between September 30, 1996, and June 30, 2000, a fact reflected both in the first mortgage and the Stipulation.

When WBF and Fuller executed the first mortgage in September of 1990, the principal owed was $3,075,850. (*WBF III;* Stipulation, R.R. at 37a; First Mortgage, R.R. at 2713a; Promissory Note, R.R. at 2739a.) The Stipulation shows $8,063,581.01 of principal owing on the first mortgage as of June 30, 2000, an increase of $4,987,730.01 over the original principal amount. The discrepancy is easily explained by looking at the Stipulation and the Promissory Note (Note) affiliated with the first mortgage.

The Note requires that WBF pay Fuller mortgage interest going forward on that original principal at a rate of 10% per year, compounded monthly.[13] The fact that interest was to be compounded monthly meant that every month, whatever interest had accrued was to be added to the principal balance of the mortgage. Then, in subsequent months, interest was calculated based on that higher balance of principal. (R.R. at 1700a–01a.) Consistent with that Note and standard practice relating to compound interest, the Stipulation's new principal reflects the inclusion into the original principal of the mortgage interest that accrued between 1990 and 2000. Moreover, in the parenthetical referring to accrued interest for the first

---

**12.** LNAA reasons as follows:
1. The jury verdict is $10,410,000.
2. **On June 30, 2000, the accrued interest on the first mortgage was $0.**
3. LNAA paid Fuller EJC in the amount of $3,150,000 on November 2, 2000.
4. The accrued interest on the first mortgage between June 30, 2000, and November 2, 2000, is $275,429.
5. After deducting the $275,429 of accrued interest on the first mortgage, $2,874,571 of EJC remains.
6. **Deducting $2,874,571 from the jury verdict leaves $7,535,429 of outstanding verdict as of November 2, 2000.**
7. To this $7,535,429, add: delay damages **(based on the $7,535,429 outstanding verdict as of November 2, 2000)** through September 9, 2008, of $7,679,638.98; additional mortgage interest on the reduced first mortgage through September 9, 2008, of $4,121,225.45; mortgage interest on the second mortgage of $117,615.53; and other costs (attorneys', engineering and appraisal fees) totaling $437,125.02.
8. Yielding a total award as of September 9, 2008, of $19,891,033.98.
(LNAA's brief at 46, *see* R.R. at 1844a–45a.) (Emphasis added.)

**13.** For a brief initial period, from September 27, 1990, to November 15, 1990, the interest rate was 15% per annum; thereafter, the rate was 10% per annum, compounded monthly. (Note at 1, R.R. at 2739a.) By means of the Stipulation, the parties agreed that, as of June 30, 2000, continuing interest on the first mortgage would change from compound interest to simple interest.

mortgage, the Stipulation states "all interest compounded to 06.30.00," thereby explaining why the accrued interest at that point was $0 and clarifying that the previously accrued interest was now included in the new principal balance going forward. (R.R. at 39a.) LNAA's own expert witness agreed with this interpretation, (R.R. at 1776a–78a), and LNAA's contrary position simply is incorrect.

Having determined that mortgage interest did accrue on the first mortgage between September 30, 1996, and June 30, 2000, we also agree that WBF accurately calculated the amount of accrued mortgage interest to be $2,703,393 [14] as of November 2, 2000, when LNAA paid the EJC.[15] Thus, pursuant to the Stipulation, $2,703,393 of the $3,150,000 was required to be applied against the first mortgage interest, leaving $446,607 of EJC to be applied against the jury verdict and, correspondingly, against the remaining principal balance owed on the first mortgage.[16] Therefore, as of November 2, 2000, any delay damages must be based on the outstanding just compensation award of $9,962,393 ($10,410,000–$446,607) rather than the smaller amount claimed by LNAA.

In a separate argument, LNAA contends that WBF ultimately failed to credit LNAA for the mortgage interest paid by virtue of the EJC payment. LNAA points out that, according to WBF's calculations, total accrued interest under the first mortgage was $6,592,625 between September 30, 1996, and May 2, 2008. According to LNAA, the $6,592,625 figure re-adds the $2,703,393 (mortgage interest between September 1996 and November 2000) that previously had been deducted when the EJC was paid, an error admitted by WBF's expert witness, Marc Sznajderman, (R.R. at 1742a, 1745a). Thus, LNAA argues that, at a minimum, $2,703,393 should have been deducted from the molded verdict amount calculated by WBF. (LNAA's brief at 51–52.) However, LNAA ignores the fact that the trial court fully accounted for the $3,150,000 EJC by deducting it from WBF's calculated gross amount of compensation in order to reach the final net molded verdict, (Order of September 17, 2008, attachment to LNAA's brief), a forthcoming adjustment to which Sznajderman alluded to in his testimony. (R.R. at 1742–47a.) Thus, LNAA's alternative argument fails.

Accordingly, we affirm.

14. Between September 27, 1990, and September 30, 1996, the mortgage principal plus accrued interest amounted to $5,635,616.53. When the Stipulation was entered on June 30, 2000, this amount had increased to $8,063,581.01. By November 2, 2000, when LNAA paid the EJC, the amount was $8,339,009.99 (an increase of $275,429, consistent with LNAA's calculations). Therefore, the accrued interest between September 30, 1996, and November 2, 2000, was $2,703,393 ($8,339,009–$5,635,616). (R.R. at 194a–95a.)

15. LNAA contends that the trial court ignored the terms of the Stipulation and erroneously credited LNAA for the EJC at the end of its calculations, on May 2, 2008, rather than on November 2, 2000, when the EJC was paid. According to LNAA, in doing so, the trial court violated the directive in the Stipulation to apply the EJC "upon receipt by Fuller" and prevented LNAA from obtaining the benefit of the reduced amounts of jury verdict and mortgage interest when the delay damages and mortgage interest were calculated from November 2, 2000, onward. This contention is belied by the calculations appearing in WBF's motion to mold the verdict, which were adopted by the trial court. There is no question that WBF accounted for the payment of the EJC as of November 2, 2000, (R.R. at 192a, 195a); it just did not do so in a way that pleased LNAA.

16. LNAA and WBF appear to agree that the principal was thereby reduced to $5,189,010 as of November 3, 2000. (R.R. at 195a, 239a.)

## ORDER

AND NOW, this 28th day of April, 2009, the order of the Court of Common Pleas of Lehigh County, dated October 10, 2008, is hereby affirmed.